IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 5, 2010

**STATE OF TENNESSEE v. CHARLES HALL**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 04-00120     James M. Lammey, Jr., Judge**

---

**No. W2009-02569-CCA-R3-CD  - Filed December 10, 2010**

---

The defendant, Charles Hall, was convicted by a Shelby County Criminal Court jury of two counts of alternate theories of aggravated robbery, a Class B felony.  The court merged the second count into the first count and sentenced the defendant as a repeat violent offender to life without the possibility of parole.  On appeal, the defendant argues that: (1) the pretrial photographic identification by the victim was overly suggestive and the trial court erred in failing to hold an evidentiary hearing or rule on his motion to suppress the identification; (2) the trial court erred in allowing evidence that a small child was present during the commission of the robbery; (3) he was dissuaded from testifying because of the comments of the prosecutor and trial court; (4) the evidence was insufficient to sustain his convictions; (5) the trial court erred in determining that he was a repeat violent offender; and (6) the trial court erred in ordering consecutive sentences.  After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which J.C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

Matthew Ian John, Memphis, Tennessee, for the appellant, Charles Hall.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; William L. Gibbons, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This cases arises out of the February 2003 robbery of Sherron Jefferson, the victim, an employee of the Wonder Bread store on South Third Street in Memphis. As a result, the defendant was indicted on two counts of alternate theories of aggravated robbery. The indictment was consolidated with another indictment, case number 04-00119, for trial; however, on August 11, 2006, this court reversed the defendant's convictions in the two cases and remanded for separate trials as to each indictment. See State v. Charles Hall, No. W2005-01338-CCA-R3-CD, 2006 WL 2334850, at *1, *7 (Tenn. Crim. App. Aug. 11, 2006), perm. to appeal denied (Tenn. Dec. 18, 2006).

## State's Proof

The victim testified that she was working at the Wonder Bread store on Sunday, February 23, 2003. As she was stocking shelves in the back room in preparation of closing, the victim noticed that a man, identified as the defendant, had entered the store through the front door. As the defendant entered, a young boy also entered the store, yelling to the victim that she had a customer. The victim called to the front that she would help him shortly, but the defendant walked from the front and into the office that bisected the store. The defendant brandished a "[l]ittle silver gun" in his right hand and told her to cooperate. Upon seeing the gun, the victim was frightened, afraid that the defendant was going to kill her.

The defendant told the victim to go to the front of the store, display the "closed" sign, and lock the door. When the victim complied with the defendant's demand, she noticed that the young boy, who appeared to be nine years old, was still in the store. She explained that it was normal for the neighborhood children to hang around the store and help with tasks in exchange "for a cake or something." The defendant held the boy's hand in his left hand and the gun in his right hand as he told the victim to go to the cash register and not sound any alarms. The defendant told her to remove only the cash from the register and put it in a plastic bag. The victim did as she was instructed, placing approximately $100 in a store bag. The victim handed the money to the defendant "[b]ecause he had a gun, and [she] was afraid."

The victim testified that the defendant then asked for the videotape from the store's surveillance camera. When the victim tried unsuccessfully to eject the tape from the VCR, the defendant became agitated. The victim attempted to remove the VCR from the wall, and the defendant "snatched it and stepped on it, and that's the only way we got the tape out of it." The defendant had the victim show him a door in the stock room he could use as an exit and then placed the victim and young boy in the bathroom with instructions not to come out for fifteen minutes. The defendant threatened to hurt them if they came out of the bathroom before he left.

The victim testified that after fifteen to twenty minutes, they exited the bathroom, and she called the nearby fire station. By the time the fire department personnel arrived, the young boy had left the store. Police officers arrived in less than ten minutes after the fire department personnel, and she told them what had happened. However, she did not mention anything about the young boy being present because "[t]hey never asked [her] was anybody in the store. They just asked [her] about the robbery." The victim admitted that she later gave a statement to Sergeant Bell in which she again did not mention the young boy. She explained that she did not mention him because

> he was upset about [the robbery]. And I was upset. And I didn't want to put him through what I had to go through because his mom - during that time, his mom had said he was already having problems, so I didn't want to take him through it, so I never mentioned him.

She elaborated that she spoke with the boy's mother about the incident because he had told his mother about what had happened. The victim said that the first time she mentioned the presence of the young boy was when she was asked a question by the defendant's attorney at another court proceeding.

The victim testified that she gave a brief description to the police that the defendant was tall and light-skinned. At trial, she recalled that the defendant was wearing blue jeans, a yellow-orange "bubble" jacket pulled up over the bottom of his face, a "skull hat," and rubber surgical gloves. She estimated that the entire ordeal, including the time they waited in the bathroom, lasted thirty minutes. She was within one to two feet of the defendant the entire time, and nothing impaired her view. The victim explained that she had been instructed by her employer that in the event of a robbery, to look at the perpetrator's eyes in hopes of later making an identification. The victim said that she looked at the defendant's face but focused on his eyes as a way of letting him know that she was going to cooperate.

The victim testified that she viewed a photographic array on March 13, 2003, from which she identified the defendant as the robber because "[she] recognized him through his eyes." She said that she also recognized the defendant's forehead, nose, cheeks, and mustache area. She recalled that the defendant's photograph "jumped out" at her, so she took a piece of paper to cover part of his forehead and mouth "to make sure [she] was picking the right guy." The victim said that in addition to the photographic array, she also identified the defendant at a preliminary hearing, at a motion hearing, and at another court proceeding.

On cross-examination, the victim admitted that it was untruthful for her to have previously testified that the first time she spoke with anyone about the young boy being

-3-

present was when defense counsel asked her at a prior proceeding when she had actually spoken with the boy's mother. She also admitted that it was untruthful for her to have not mentioned the boy when asked to give a detailed description of the incident. The victim said that she never told Sergeant Bell prior to viewing the photographic array that the robber's eyes were the feature by which she would be able to identify him. When shown the photographic array, the victim admitted that she would not have picked two of the individuals because their eyes were closed but said that she still looked at their photographs. The victim acknowledged, in looking at a photograph of the defendant, that the defendant had a scar in his left eye, but she did not include a scar in her description.

On redirect examination, the victim testified that she did not select the individuals in the array who had their eye or eyes closed because neither of them was the individual who robbed her.

Boris Owens testified that he and his mother were outside the Wonder Bread store on February 23, 2003, when they saw a light-skinned, African-American man who was approximately 6'1" exit out the seldom-used side door of the store. They went to the front door of the store and it was locked. They looked inside and saw that the cash register was lying on the counter. Owens never saw a young boy or a woman come out of the store.

The prior sworn testimony of Officer Sherman Bonds was read into evidence. In that testimony, Officer Bonds stated that he worked in the Memphis Police Department's Crime Scene Unit. On February 23, 2003, Officer Bonds was called to the scene at the Wonder Bread store on South Third Street. Officer Bonds dusted a VCR for prints but was unable to obtain any.

Lieutenant William Woodard with the Memphis Police Department testified that he was involved in the investigation of the Wonder Bread store robbery. Lieutenant Woodard made a follow-up call to the victim the day after the robbery to obtain any additional details. The victim never mentioned a young boy being present, nor did he ask if a young boy was there. Lieutenant Woodard typed a synopsis for the case file and waited for more information to come in. At some point, the officer received a Crime Stoppers tip identifying the Wonder Bread store and the defendant by name and giving a few details about the defendant. Lieutenant Woodard obtained an old booking photograph of the defendant based on the information gathered from the tip. Approximately five days later, Lieutenant Woodard received a call inquiring about the status of the prior Crime Stoppers tip and providing the same, plus some additional, information. Lieutenant Woodard did not take a formal, written statement from the victim, and he explained that it was not uncommon to wait for an arrest to be imminent before obtaining a written statement. The case was transferred to Sergeant J.B. Bell of the Memphis Police Department.

-4-

On cross-examination, Lieutenant Woodard acknowledged that the victim told him during their conversation the day after the robbery that she did not think she could identify the robber and such was noted in the report supplement. He also acknowledged that he was able to create a photographic array based on information received from the Crime Stoppers tip, not from any information given by the victim.

Sergeant J.B. Bell, Jr. testified that he was transferred to the Wonder Bread store robbery case after the Crime Stoppers tip came in because he was working on a similar case. Upon receiving the case, Sergeant Bell contacted the victim who gave him a general description of the robber, including the robber's hair and eyes and that he had "a little mustache" and was light-complected. Based on the information given by the victim, along with the information from the Crime Stoppers tip, Sergeant Bell assembled a photographic array depicting the defendant and five other individuals similar to the defendant and matching the victim's general description. He first attempted to assemble the array with the help of a computer system. However, the computer kept suggesting "real old men" and men with "gray hair and afros," so Sergeant Bell had to create the array manually to ensure that the defendant did not stand out in the array.

Sergeant Bell testified that he had the victim read and sign an advice form prior to viewing the array on March 13, 2003, and the victim appeared to understand the instructions. The victim looked at all the individuals and used paper to cover up their faces even though she "seemed kind of startled," as if she recognized someone, upon initially seeing the array. The victim pointed out the defendant and said that she was absolutely sure of her identification. The victim gave a formal statement within a day or two of making the identification.

Sergeant Bell testified that the victim never told him about a young boy being present during the robbery, and he never asked her if one was present. The victim never affirmatively told him that she was alone. Sometime after the victim made the identification, Sergeant Bell spoke with the defendant at the robbery office and noticed nothing unusual about the defendant's appearance. At an earlier court proceeding, Sergeant Bell was asked to look at the defendant from a distance of two to three feet, during which time he eventually noticed that one of the defendant's eyes was smaller than the other. He was also able to see, after the defendant pointed it out, that the defendant had a small scar on his eye.

On cross-examination, Sergeant Bell recalled that the victim mentioned the defendant's eyes when she selected him from the array, but she had never given a description of the robber's eyes. Asked why he included photographs of two individuals in the array in which the view of the individuals' eyes was impeded, Sergeant Bell explained that they had similar features to the defendant and he "didn't have information about the [importance of

the] eyes when [he] [created the array]." Sergeant Bell clarified that the victim made the identification and then began mentioning the robber's eyes. Sergeant Bell admitted that in the statement given by the victim the day after the photographic identification, she did not mention anything about the robber's eyes or mustache in her description.

On redirect examination, Sergeant Bell stated that he would not have changed the course of his investigation in any way had he known that a young boy was present except that he probably would have charged the defendant with an additional offense.

**Defendant's Proof**

Georgia Johnson, the defendant's first cousin, testified that the defendant had a noticeable dark spot in one of his eyes since childhood. She said that the defendant would have been in his early to mid-fifties in 2003.

Robert Lively, owner of Courtesy Consultants, a security company, employed the defendant as a security guard for an apartment complex in 2003. Lively never received any complaints from the apartment complex about the defendant not showing up for work, and Lively characterized the defendant as a good employee. He recalled that the defendant filled out a time sheet that indicated he was working from 1:00 to 9:00 p.m. on February 23, 2003. However, Lively could neither confirm nor deny that the defendant actually worked the hours he claimed to have worked on the day of the robbery. Lively acknowledged that regarding one of the other days reported on the time sheet, the defendant was docked three hours from what he reported due to his not responding when the base radioed him. Lively acknowledged that he never got the radio belonging to Courtesy Consultants back from the defendant after his employment ceased. If he were informed that the defendant had pawned the radio on twenty occasions, he would not have considered him a good employee. Lively said that in the approximately nine months that the defendant worked for him, the defendant asked for an advance on his paycheck on more than one occasion.

After the conclusion of the proof, the jury convicted the defendant as charged of two counts of aggravated robbery.

## ANALYSIS

### I. Pretrial Identification / Motion to Suppress

The defendant argues that the photographic array from which the victim made a pretrial identification was overly suggestive and that the trial court erred in failing to hold an evidentiary hearing or rule on his motion to suppress the identification prior to trial.

Defense counsel, who was a different attorney than the defendant's attorney at the first trial, filed over twenty motions prior to the second trial. It appears that the State did not respond to, pertinently, the defendant's motion to suppress, nor did the court explicitly rule on the motion. However, discussion at the motion for new trial indicates that the defendant had a conversation with the trial court at some point in which it was discussed that "some motions had been filed but that they had already been ruled on . . . and the court decided just to go ahead and proceed based on . . . the issue of suppression had already been ruled on." The State further indicated at the motion for new trial hearing that, because the case was reversed only on the consolidation issue, it did not go through the redundancy of dispensing of the pretrial motions a second time. From our opinion on direct appeal following the first trial, we glean that a hearing on a motion to suppress was held and that the motion was apparently denied as the photographic identification was mentioned at that trial.

The defendant provided no authority in support of his assertion that the trial court erred in apparently relying on the original trial court's ruling and not holding an evidentiary hearing on the suppression motion. In any event, the crux of the defendant's complaint is that the pretrial photographic identification was so impermissibly suggestive that the victim's identification was unreliable, which we will address.

In Neil v. Biggers, 409 U.S. 188, 199 (1972), the United States Supreme Court established a two-part test to determine when a defendant's due process rights have been violated by a pretrial identification. Our supreme court has adopted the same standard to be applied by our courts for assessing whether a pretrial identification has violated the due process rights of the defendant, thereby tainting any in-court identification made by the witness. See Bennett v. State, 530 S.W.2d 511, 512-15 (Tenn. 1975). Under this test, the court first considers whether the identification procedure itself was unduly or unnecessarily suggestive. Biggers, 409 U.S. at 199. The risk of irreparable mistaken identification is heightened if one of the photographs in the photographic lineup "is in some way emphasized," or if "the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." Simmons v. United States, 390 U.S. 377, 383 (1968).

If the identification procedure is found to have been suggestive, the court next considers "whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive." Biggers, 409 U.S. at 199 (internal quotations omitted). The factors to be considered in evaluating the reliability of an identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. Id. If,

however, the court first determines that the identification procedure itself was neither unnecessarily or impermissibly suggestive nor likely to create a substantial likelihood of irreparable misidentification, there is no need to apply the totality of the circumstances test outlined in Biggers. See State v. Leon J. Robins and Tabatha R. White, No. M2001-01862-CCA-R3-CD, 2003 WL 1386835, at *9 (Tenn. Crim. App. Mar. 20, 2003) (citing State v. Butler, 795 S.W.2d 680, 686 (Tenn. Crim. App. 1990)), perm. to appeal denied (Tenn. Oct. 13, 2003).

Upon review of the photographs in the array, we cannot conclude that the defendant's photograph was "grossly dissimilar" to the others. State v. Edwards, 868 S.W.2d 682, 694 (Tenn. Crim. App. 1993) (citing United States v. Wade, 388 U.S. 218, 233 (1967), for the proposition that "a lineup would be considered unduly suggestive only when the other participants were grossly dissimilar"). The array includes color photographs of six African-American males with short haircuts and small mustaches. No one photograph background sticks out as the backgrounds are all different – varying from pure white to blue. The defendant is correct in pointing out that not all the individuals are of the same complexion, and one of the pictured individuals has his eyes closed and another individual has one eye closed. However, our supreme court has previously ruled that the "[p]hotographs contained in a photographic array do not have to mirror the accused," State v. Hall, 976 S.W.2d 121, 153 (Tenn. 1998), and the victim had not expressed any significance of the eyes. In viewing the array, the victim was told that the robber may or may not be depicted and was advised not to select anyone unless she was positive of the identification. The defendant places much emphasis on Sergeant Bell's manually creating the array instead of using a computer-generated program, but Sergeant Bell explained that he created the array manually because the computer suggested individuals with drastically dissimilar characteristics. In sum, we cannot conclude that the photographic identification was unnecessarily suggestive.

Moreover, even if the identification procedure was suggestive, a review of the five Biggers factors indicates that the victim's identification of the defendant was nonetheless reliable. First, the victim was within one to two feet of the robber during the incident, in a well-lit store with nothing impairing her view. Second, it is apparent that the victim's degree of attention was high as she had been instructed by her employer that in the event of a robbery, to look at the perpetrator's eyes in hopes of later making an identification, and she said that she looked at the robber's face and focused on his eyes also as a way of letting him know that she was going to cooperate. Third, the victim's initial description of the robber as tall and light-skinned, although very general, was accurate. Fourth, the victim "seemed kind of startled," as if she recognized someone, upon initially seeing the array, and then pointed out the defendant and said that she was absolutely sure of her identification. The victim affirmed at trial that she was certain of her identification. Fifth, the victim was shown the photographic array only two and a half weeks after the robbery. Upon consideration of

the Biggers factors and the totality of the circumstances, we conclude that the photographic identification of the defendant was reliable.

## II. Evidentiary Ruling

The defendant argues that he was unfairly prejudiced by the trial court's allowing the State to introduce into evidence that a small child was present during the robbery. He asserts that it was improper for the State to elicit such information on direct examination, and the court should have excluded such evidence under Tennessee Rule of Evidence 403, as the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

At the original trial in this matter, defense counsel, on cross-examination of the victim, asked the victim whether anyone else was with her at the time of the robbery. The victim then admitted that there was a small boy in the store at the time and said that she had not told anyone because the boy's mother did not want him to be involved. At the retrial, the State commented in its opening statement that the jury would hear that a small boy was present during the robbery. Thereafter, on direct examination, the victim testified that a small boy was inside the store when the defendant entered and was present throughout the commission of the robbery. She said that the defendant held the boy's hand, while he held a gun in the other hand. She stated that the boy was locked in the bathroom with her when the defendant was preparing to leave the store. The victim testified that she never told anyone, including the police, that the boy was present until the defendant's previous counsel asked her during a prior proceeding. She said that the reason she never told anyone was because she was not specifically asked and because the boy's mother did not want him involved.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. See State v. McLeod, 937 S.W.2d 867, 871 (Tenn. 1996). Tennessee Rule of Evidence 401, which governs the initial issue of admissibility, requires the trial court to first determine whether the proffered evidence is relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Tennessee Rule of Evidence 403 provides that, even if relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.

We initially note that it does not appear that the defendant ever objected on the ground that he is alleging on appeal. He did object to the victim's testifying that she never told anyone that a young boy was present until she was asked by the defendant's attorney

at a previous proceeding. His ground for that objection was that the jury's hearing that the information was elicited by the defendant's attorney allowed the jury to infer that the defendant must have been the robber because only the perpetrator would know if someone else was present. However, on appeal, the defendant is seemingly disputing that the boy was even mentioned at all, which is in essence a different ground.

In any event, we conclude that the defendant is not entitled to relief on this issue for a number of reasons. First, counsel's assertion that he had no knowledge of the victim's claim that a boy was present because he was not the attorney who handled the first trial is unpersuasive as he apparently read this court's opinion on the original appeal which clearly apprised him of the boy. Second, we fail to see how the State's preemptively mentioning the boy and eliciting an explanation from the victim as to why she did not tell anyone about him caused the defendant any unfair prejudice. Defense counsel thoroughly cross-examined the victim about her failure to tell anyone, and she admitted that it was untruthful for her to have withheld the information. Third, the defendant offered no authority for his proposition that the State should not have been allowed to introduce evidence that a boy was present unless and until he first elicited the information on cross-examination. The defendant is not entitled to relief.

## III. Decision Not to Testify

The defendant argues that he was effectively forced not to testify because the State "threatened" to seek introduction of "even more convictions" if he chose to testify, and he perceived that the trial court would acquiesce to the introduction of the convictions.

Tennessee Rule of Evidence 609 provides that a conviction may be used to impeach the testimony of an accused in a criminal prosecution if the following four conditions are satisfied: (1) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (2) less than ten years has elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (3) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (4) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues. Id.; State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999).

Moreover, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R. Evid. 404(b). Such evidence is admissible for other purposes, however, provided that the trial court (1) upon request, holds a hearing outside the jury's presence; (2) determines that

-10-

a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not outweighed by the danger of unfair prejudice. Id.

The court ruled under Rule 609 that it would allow the State to question the defendant regarding his six 1989 Tennessee convictions and one 1989 Mississippi conviction for aggravated robbery but not the conviction that resulted from an aggravated robbery that took place on February 20, 2003 – three days before the present offense – because of the danger of unfair prejudice. The State announced that if the defendant chose to testify, it would ask the court to conduct a 404(b) hearing to determine whether it could introduce evidence of the 2003 aggravated robbery as proof of the defendant's identity as the perpetrator in the present case. We have reviewed the entire discourse and conclude that the defendant's claim is completely without merit. The comments referenced by the defendant were made in the context of considering the probative value of his past crimes of dishonesty should he place his credibility before the jury and in clarifying all the potential ramifications of his decision. We discern no threatening tone to the discourse. Even after the discussion, the defendant still voiced his decision to testify, and it was not until the following day, after further consideration and conversations with counsel, that he changed his mind. The defendant made an informed and voluntary decision to not testify.

## IV. Sufficiency of the Evidence

The defendant challenges the sufficiency of the convicting evidence, arguing that because the victim was untruthful, her identification of him as the robber was insufficient to sustain his convictions. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754

-11-

S.W.2d 620, 623 (Tenn. Crim. App. 1987). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

As pertinent here, aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear," Tenn. Code Ann. § 39-13-401(a), "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Id. § 39-13-402(a)(1).

The defendant does not dispute that an aggravated robbery occurred; he only contends that he was misidentified as the robber. The identity of the defendant as the perpetrator of the offense is a question of fact for the jury. State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993). The identification testimony of the victim is sufficient, alone, to support a conviction. Id. In the light most favorable to the State, the evidence shows that the victim first identified the defendant as the robber from a photographic array within three weeks of the robbery, from which the defendant's photograph "jumped out" at her. The victim also identified the defendant at a preliminary hearing, at a motion hearing, and at another court proceeding in addition to the present trial. The victim was within one to two feet of the defendant during the incident and nothing was impairing her view. She recalled that she had been instructed by her employer that in the event of a robbery, to look at the perpetrator's eyes in hopes of later making an identification.

The defendant impugns the victim's trustworthiness as a witness because of her repeatedly failing to mention that a boy was present during the robbery when asked to give a specific account of the robbery and for saying that she had not spoken with anyone about a boy being present when she had actually spoken with the boy's mother. However, any issues concerning the credibility of the witnesses were resolved by the jury as the trier of fact.

The victim explained that she did not provide the information because she was not specifically asked and because the boy's mother did not want him to get involved in the matter. The defendant rigorously cross-examined the victim – challenging her credibility before the jury. The jury apparently accepted the victim's explanation and found her identification of the defendant credible. We will not second-guess its determinations.

## V. Sentencing

At the sentencing hearing, the trial court merged the two counts of which the defendant was presently convicted into one conviction. For that conviction, the court sentenced the defendant as a repeat violent offender to life imprisonment without the possibility of parole to be served consecutively to another life sentence without the possibility of parole. The defendant challenges both of these findings.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2006). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2006); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2006), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

## A. Repeat Violent Offender

At the sentencing hearing, the State argued that the defendant qualified as a repeat violent offender based on his December 8, 1969 robbery with a deadly weapon conviction in Shelby County; his 1980 aggravated robbery with a firearm conviction in Arkansas; a February 1, 1989 robbery with a deadly weapon conviction in Mississippi; six April 6, 1989 robbery with a deadly weapon convictions in Shelby County; and an aggravated robbery conviction in case number 04-00119, the case that took place on February 20, 2003 and had previously been consolidated with the present case.

Addressing the defendant's periods of confinement and release, the State pointed out that the defendant was discharged from confinement on his 1969 conviction directly to confinement in Arkansas for his 1980 conviction, and he was paroled to supervision in Tennessee on April 1, 1988. Approximately four months later, before his parole was complete, the defendant was arrested in Shelby County on August 19, 1988 on six counts of robbery with a deadly weapon of which he was ultimately convicted. The defendant was discharged from Tennessee to confinement in Mississippi on September 4, 1993 because the defendant had also accrued eight aggravated robbery charges in Mississippi during the four months he had been out of custody in 1988. By agreement, the defendant pled guilty to one count and the remaining seven counts were nol prossed. He was released from Mississippi custody on January 2, 2001, and was on parole when he was arrested on March 13, 2003 for the offenses in this case and case number 04-00119.

The defendant complained that some of his prior convictions were labeled robbery with a deadly weapon and therefore did not qualify as aggravated robbery for purposes of the repeat violent offender statute. The State responded that the statute addressed the effect of the 1989 renaming of offenses and included robbery with a deadly weapon within its purview. The court found that the statute applied and noted that "[i]t would be a travesty to say that just because it wasn't styled aggravated robbery – that it was styled robbery with a deadly weapon allows someone – so, I am satisfied that he is a repeat violent offender beyond any doubt."

Pursuant to Tennessee Code Annotated section 40-35-120(a), a defendant qualifies as a repeat violent offender if he or she satisfies one of three separate criteria. To qualify, a defendant can meet the criteria found in either (a)(1) and (2); or (a)(3) and (4); or (a)(5) and (6). As pertinent here, section 40-35-120(a)(1) and (2) provides that a "'repeat violent offender' is a defendant who: (1) [i]s convicted . . . of any offense classified in subdivision (b)(1) as a violent offense; and (2) [h]as at least two (2) prior convictions for offenses classified in subdivision (b)(1) or (b)(2) as a violent offense[.]" Tenn. Code Ann. § 40-35-120(a)(1), (2). Subdivision (b)(1) specifically designates aggravated robbery as a violent

-14-

offense. See id. § 40-35-120(b)(1)(I). Subdivision (b)(2) states that "[f]or purposes of subdivision (a)(2), the offenses which were repealed on November 1, 1989, and are listed in § 40-35-118 as Class A or B felonies against a person are classified as violent offenses." Id. § 40-35-120(b)(2). Section 40-35-118 provides that "robbery by use of a deadly weapon," former section 39-2-501, is the equivalent of a Class B felony. Id. Although there is an exception for robbery by use of a deadly weapon as a qualifying offense for purposes of (a)(5) and (6), there is no such exception for offenders satisfying the criteria of (a)(1) and (2), or (a)(3) and (4). The Code additionally sets as a requirement that the defendant have served two separate periods of incarceration for the commission of at least two of the predicate offenses before committing one of the designated offenses. Id. § 40-35-120(e)(1)(A).

On appeal, as at the sentencing hearing, the defendant asserts that he was improperly classified as a repeat violent offender because some of his prior convictions were classified "robbery with a deadly weapon" instead of "aggravated robbery," and the State did not present the facts and circumstances of his prior convictions to determine whether "robbery with a deadly weapon" should be considered "aggravated robbery." However, as noted above, the statute specifically addressed the titling of offenses committed before the 1989 revisions and provided that "robbery with a deadly weapon" was the equivalent of a Class B felony and classified as a violent offense, such to fall under the purview of the statute. The trial court did not err in sentencing the defendant as a repeat violent offender to life imprisonment without the possibility of parole.

### B. Consecutive Sentences

The State urged the court to order that the defendant's sentence be served consecutively to his sentence in case number 04-00119. The State asserted that the defendant was a dangerous offender and that it "would seriously depreciate the seriousness of this offense" for him to be sentenced to anything less than life imprisonment without parole consecutive to life imprisonment without parole. The State noted that the defendant's "record is absolutely atrocious – that anybody could spend less than three years out [of] his entire adult life on the street because the rest of his time has been spent incarcerated for aggravated robbery is absolutely unthinkable." The defendant argued that the court was not presented with the facts underlying the defendant's prior convictions and pleas to determine whether he should be classified a dangerous offender.

The trial court found that "it would strain the imagination to think that there would be anyone more deserving of the label of dangerous offender than [the defendant] – ten prior convictions for aggravated robbery or robbery with a deadly weapon." The court determined that the defendant's behavior indicated little or no regard for human life and that he had no

hesitation about committing a crime in which the risk to human life was high. The court observed that one would think that the defendant, after serving most of his adult life in prison, would pause before committing another aggravated robbery, but he did so twice. The court found that confinement for an extended period of time was necessary to protect society from the defendant's unwillingness to lead a productive lifestyle and resort to criminal activity in furtherance of an anti-social lifestyle, and that an extended sentence reasonably related to the severity of the offense. The court concluded that "[t]o say that [the defendant] is not a dangerous offender would be an insult to the decent law-abiding citizens of the [S]tate of Tennessee."

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of a number of criteria by a preponderance of the evidence, including:

> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> . . . .
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high[.]

Tenn. Code Ann. § 40-35-115(b). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. When a trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it is required to make further findings that the aggregate length of the defendant's sentence reasonably relates to the severity of his offenses and is necessary to protect the public from further criminal conduct of the defendant. State v. Lane, 3 S.W.3d 456, 460-61 (Tenn. 1999); State v. Wilkerson, 905 S.W.2d 933, 937-38 (Tenn. 1995).

On appeal, the defendant argues that the trial court erred in finding that he was a dangerous offender for the purpose of ordering consecutive sentences. He asserts that the trial court, although using the requisite language, did not "provide anything substantive to support [its] finding." We disagree. The sum of the trial court's findings shows that the court addressed the relevant considerations, and we likewise agree that the defendant qualified as a dangerous offender. Moreover, it is clear from the court's findings that in addition to determining that the defendant was a dangerous offender, the court considered the defendant's extensive record of criminal activity in ordering consecutive sentences. The record shows that the defendant has at least ten aggravated robbery or robbery with a deadly

weapon convictions, a host of misdemeanor convictions, and convictions for robbery with a deadly weapon and grand larceny committed when he was sixteen years old but tried in criminal court. It appears that the sixty-two-year-old defendant has been incarcerated for all but three years of his adult life. The trial court acted properly within its discretion in ordering consecutive sentences.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE